**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| NANCY G. STAVELY, Derivatively on Behalf of FIRSTENERGY CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL J. ANDERSON, STEVEN J. DEMETRIOU, JULIA L. JOHNSON, CHARLES E. JONES, DONALD T. MISHEFF, THOMAS N. MITCHELL, JAMES F. O'NEIL III, CHRISTOPHER D. PAPPAS, SANDRA PIANALTO, LUIS A. REYES, LESLIE M. TURNER, STEVEN E. STRAH, ROBERT P. REFFNER, MICHAEL J. DOWLING, EBONY YEBOAH-AMANKWAH, K. JON TAYLOR, and JAMES F. PEARSON, <br><br> Defendants, <br><br> and <br><br> FIRSTENERGY CORPORATION, <br><br> Nominal Defendant. | Case No. _____ <br><br> JURY TRIAL DEMANDED <br><br> **JURY DEMAND <br> <u>ENDORSED HEREON</u>** |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiff Nancy G. Stavely ("Plaintiff"), by her undersigned attorneys, for this complaint against Defendants (defined below), alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel and a review of, among other things, public filings, United States Securities and Exchange Commission ("SEC") filings, press releases, news reports, analyst reports, and investor conference transcripts, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of nominal defendant FirstEnergy Corporation ("FirstEnergy" or the "Company") against certain officers and directors of the Company.

2.     As alleged herein, Defendants adopted a corporate policy of providing illegal payments to government officials, including Ohio Speaker of the House Larry Householder ("Householder"), in exchange for Householder securing the passage of legislation that provided a $1.3 billion bailout of the Company's failed nuclear power plants.

3.     On July 21, 2020, the U.S. Attorney's Office for the Southern District of Ohio announced that Householder and certain affiliates (together, the "Enterprise") were arrested and charged in a federal racketeering conspiracy involving approximately *$60 million* paid by FirstEnergy and affiliates to a 501(c)(4) entity to pass and uphold the nuclear plant bailout (the "Criminal Action").  *See USA v. Borges*, Case No. 1:20-mj-00526 (S.D. Ohio).

4.     Within hours of the announcement of the Criminal Action, FirstEnergy's stock lost up to forty-five percent of its value.

5.     As set forth herein, Plaintiff seeks relief against Defendants for their breaches of fiduciary duties and other violations of law, which have substantially injured and will continue to substantially injure the Company.

## JURISDICTION

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

7.     This Court has supplemental jurisdiction over the state law claims asserted herein

pursuant to 28 U.S.C. § 1367(a).

8.      Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

9.      This action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

10.     The Court has personal jurisdiction over each of the Defendants because each Defendant is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

12.     Plaintiff was a stockholder of FirstEnergy at the time of the misconduct complained of herein, and has been a stockholder of First Energy continuously since that time.  Plaintiff is a resident of the State of Maryland.

### Nominal Defendant

13.     Nominal Defendant FirstEnergy is an Ohio corporation with its principal executive offices located at 76 South Main Street, Akron, Ohio 44308.  The Company's stock trades on the New York Stock Exchange under the ticker symbol "FE."

### Director Defendants

14.     Defendant Michael J. Anderson ("Anderson") has served as a director of

FirstEnergy since 2007 and serves on the Finance Committee and as Chair of the Audit Committee. As of July 1, 2020, Anderson owned 59,181 shares of FirstEnergy common stock. Anderson is a resident of the State of Ohio.

15. Defendant Steven J. Demetriou ("Demetriou") has served as a director of FirstEnergy since January 2017 and serves on the Finance, Operations, Safety, and Nuclear Oversight Committees. As of July 1, 2020, Demetriou owned 9,651 shares of FirstEnergy common stock. Demetriou is a resident of the State of California.

16. Defendant Julia L. Johnson ("Johnson") has served as a director of FirstEnergy since 2011 and serves on the Finance Committee and as Chair of the Corporate Governance and Corporate Responsibility Committee. As of July 1, 2020, Johnson owned 10,750 shares of FirstEnergy common stock. Johnson is a resident of the State of Florida.

17. Defendant Charles E. Jones ("Jones") has served as President, Chief Executive Officer ("CEO"), and a director of FirstEnergy since 2015. In 2017, Jones earned over $8.75 million in compensation. In 2018, Jones earned over $9.85 million in compensation. In 2019, Jones earned over $9.07 million in compensation. On March 1, 2018, Jones sold shares of his FirstEnergy stock for $32.48 per share, yielding proceeds of over $3.7 million. On March 1, 2019, Jones sold shares of his FirstEnergy stock for $40.73 per share, yielding proceeds of over $6 million. On March 1, 2020, Jones sold shares of his FirstEnergy stock for $44.40 per share, yielding proceeds of over $10 million. Jones currently owns approximately 699,356 shares. Jones is a resident of the State of Ohio.

18. Defendant Donald T. Misheff ("Misheff") has served as non-executive Chairman of the FirstEnergy Board since May 2018 and as a director of FirstEnergy since 2012. He serves on the Audit and Corporate Governance and Corporate Responsibility Committees. As of July 1,

2020, Misheff owned 37,157 shares of FirstEnergy common stock.  Misheff is a resident of the State of Ohio.

19.     Defendant Thomas N. Mitchell ("Mitchell") has served as a director of FirstEnergy since 2016 and serves on the Corporate Governance and Corporate Responsibility Committee and as Chair of the Operations, Safety, and Nuclear Oversight Committee.  As of July 1, 2020, Mitchell owned 18,985 shares of FirstEnergy common stock.  Mitchell is a resident of the State of Georgia.

20.     Defendant James F. O'Neil, III ("O'Neil") has served as a director of FirstEnergy since January 2017 and serves on the Operations, Safety, and Nuclear Oversight Committee and as Chair of the Compensation Committee.  As of July 1, 2020, O'Neil owned 14,129 shares of FirstEnergy common stock.  O'Neil is a resident of the State of Texas.

21.     Defendant Christopher D. Pappas ("Pappas") has served as a director of FirstEnergy since 2011 and serves on the Compensation Committee and as Chair of the Finance Committee.  As of July 1, 2020, Pappas owned 49,957 shares of FirstEnergy common stock. Pappas is a resident of the State of Florida.

22.     Defendant Sandra Pianalto ("Pianalto") has served as a director of FirstEnergy since 2018 and serves on the Compensation and Audit Committees.  As of July 1, 2020, Pianalto owned 5,538 shares of FirstEnergy common stock.  Pianalto is a resident of the State of Ohio.

23.     Defendant Luis A. Reyes ("Reyes") has served as a director of FirstEnergy since 2013.  Reyes serves on the Corporate Governance and Corporate Responsibility and Operations, Safety and Nuclear Oversight Committees.  As of July 1, 2020, Reyes owned 30,782 shares of FirstEnergy common stock.  Reyes is a resident of the State of Georgia.

24.     Defendant Leslie M. Turner ("Turner") has served as a director of FirstEnergy since 2018 and serves on the Audit and Compensation Committees.  As of July 1, 2020, Turner owned

1,929 shares of FirstEnergy common stock. Turner is a resident of the State of Florida.

**Officer Defendants**

25.     Defendant Steve E. Strah ("Strah") is President of FirstEnergy. He previously served as FirstEnergy's Chief Financial Officer ("CFO") from March 2018 until May 2020. Prior to March 2018, Strah served as Senior Vice President of FirstEnergy's Utilities Operations. In 2017, Strah earned over $2.10 million in compensation. In 2018, Strah earned over $2.79 million in compensation. In 2019, Strah earned over $2.84 million in compensation. Strah is a resident of the State of Ohio.

26.     Defendant Robert Reffner ("Reffner") is Senior Vice President and Chief Legal Officer of FirstEnergy. In 2019, Reffner earned over $1.98 million in compensation. Reffner is a resident of the State of Ohio.

27.     Defendant Michael Dowling ("Dowling") is Senior Vice President, External Affairs, of FirstEnergy. Dowling is a resident of the State of Ohio.

28.     Defendant Ebony Yeboah-Amankwah ("Yeboah-Amankwah") is Vice President, General Counsel, and Chief Ethics Officer of FirstEnergy. Yeboah-Amankwah is a resident of the State of Ohio.

29.     Defendant K. Jon Taylor ("Taylor") is Chief Financial Officer ("CFO") and Senior Vice President of FirstEnergy. Taylor is a resident of the State of Ohio.

30.     Defendant James F. Pearson ("Pearson") served as CFO of FirstEnergy until March 2018. Pearson served as Vice President of Finance of FirstEnergy from March 2018 through April 2019. In 2017, Pearson earned over $3.46 million in compensation. In 2018, Pearson earned over $3.84 million in compensation. In 2019, Pearson earned over $4.05 million in compensation. On January 1, 2019, Pearson sold shares of his FirstEnergy stock for $37.87 per share, yielding

proceeds of over $1.5 million. Pearson is a resident of the State of Ohio.

31.     Defendants identified in paragraphs 14 through 24 are collectively referred to herein as the "Director Defendants."

32.     Defendants identified in paragraphs 17 and 25 through 30 are collectively referred to herein as the "Officer Defendants."

33.     Defendants identified in paragraphs 14 through 30 are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company and its Nuclear Power Plants

34.     FirstEnergy was incorporated in Ohio in 1996 and is based in Akron, Ohio. The Company's principal business is the holding, directly or indirectly, of all of the outstanding equity of its principal subsidiaries. In addition, FirstEnergy holds all of the outstanding equity of other direct subsidiaries. The Company and its subsidiaries are principally involved in the transmission, distribution, and generation of electricity.

35.     The Company owned and operated two nuclear power plants in Ohio – the Perry Nuclear Generating Station and the Davis-Besse Nuclear Power Station ("David-Besse Station") – through its subsidiaries FirstEnergy Nuclear Operating Company and FirstEnergy Solutions Corp. ("FES"). After inspectors found a major acid leak at the Davis-Besse Station, the plant was closed for substantial repairs from 2002 through 2004. The Company was ultimately fined $28 million as part of a deferred prosecution agreement for misleading regulators in connection with the damage. Subsequently, as the nuclear facilities continued to grow older, maintenance costs rose. Moreover, energy prices for alternatives to nuclear energy, such as natural gas, decreased,

and the Company's service areas experienced decreasing demand, diminishing the revenue-generating potential of the Company's two nuclear plants.

36.     By the end of 2016, the Company's nuclear generation outlook looked poor.  In the Company's 2016 annual report, the Company and its affiliates reported a weak energy market, poor forecast demands, and hundreds of millions of dollars in losses, particularly from its nuclear energy plants.  FirstEnergy announced future options for its generation portfolio, including legislative and regulatory solutions for generation assets; asset sales and plant deactivations; restructuring debt; and/or seeking protection under the bankruptcy laws for its nuclear affiliates.

37.     As a result, the Company sought a "legislative solution" for its two nuclear plants in Ohio.  During FirstEnergy's fourth quarter 2016 earnings conference call, Defendant Jones stated:

> In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security. Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero-emission nuclear program is expected to be introduced soon. The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. We believe this legislation would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region.
>
> We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that [FirstEnergy] won't be the long-term owner of these assets. We are optimistic, given these discussions we have had so far, and we will keep you posted as this process unfolds.

38.     However, attempts to obtain a legislative solution failed.

**Householder and the Enterprise**

39.     At the time FirstEnergy was searching for a solution to its nuclear power plant issues, Householder was reentering politics.  Householder regained his State House seat in Perry County, Ohio, and aimed to win back the Speakership in January 2019.

40.     In January 2017, Householder met with FirstEnergy representatives on a Company private jet.  At this time, Householder and the Company struck a corrupt bargain:  the Company would funnel millions of dollars to Householder to support his bid for Speakership, and Householder would secure the passage of legislation that would ultimately provide a $1.3 billion bailout of the Company's failed nuclear power plants.

41.     In furtherance of Householder's and FirstEnergy's plan, in February 2017, "Generation Now" was created, which was a 501(c)(4) organization that would be used to funnel dark money from FirstEnergy funds to the Enterprise.

42.     In March 2017, Householder began receiving $250,000 payments from the Company, which payments increased until they reached into the millions of dollars per month. Ultimately, more than *$60 million* was paid by FirstEnergy and its affiliates to Householder and the Enterprise in furtherance of the scheme.

43.     The Enterprise used FirstEnergy payments to support House candidates involved in primary and general elections who the Enterprise believed would vote for Householder as Speaker and, ultimately, follow his lead as Speaker and vote for bailout legislation for the Company.  The Enterprise managed the selected candidates' campaigns, paid to staff them, and designed and paid for commercials and mailers.  Most of the candidates won the 2018 general election, and all of the candidates who won voted for Householder as Speaker.  With the support from these candidates, Householder was elected Speaker in January 2019.

44.     Having secured Householder's power as Speaker, the Enterprise quickly moved to fulfill its end of the bargain:  passing nuclear bailout legislation.

45.     Not long after Householder's election as Speaker, House Bill 6 was introduced, which effectively prevented the shutdown of FirstEnergy's two failing nuclear power plants.

House Bill 6 subsidized nuclear energy operations in Ohio through a monthly charge on Ohio residents' energy bills. A member of the Enterprise described House Bill 6 as a "bailout" for FirstEnergy's nuclear assets, worth $1.3 billion to the Company.

46.    FirstEnergy continued making millions of dollars of payments into Generation Now. The Enterprise used some of the money for mailers and media advertisements to pressure members to support the legislation. Members of the Enterprise also used FirstEnergy money for their personal benefit.

47.    Householder and other Enterprise members pressured House members to vote for House Bill 6, and in May 2019, House Bill 6 passed the House. After Enterprise members placed pressure on the Senate, the legislation was passed and was signed into law by the Governor.

48.    Shortly after the Governor signed House Bill 6, a campaign began to organize a state-wide ballot initiative referendum to overturn the legislation. The campaign required organizers to collect signatures of registered voters to put the referendum of House Bill 6 on the ballot. As a result, FirstEnergy's and the Enterprise's scheme continued.

49.    From July 2019 until October 2019, FirstEnergy-controlled accounts wired tens of millions of dollars into Generation Now to defeat the ballot initiative so that House Bill 6 would go into effect. The Enterprise funneled the money to various accounts and entities controlled by the Enterprise to, among other things, purchase media ads and mailers against the ballot initiative and bribe signature collectors supporting the referendum. Members and associates of the Enterprise also used Company money to further their personal interests. By October 2019, the ballot campaign failed to collect enough signatures, and House Bill 6 went into effect.

50.    Over the approximately three-year period, FirstEnergy and its affiliates paid the Enterprise approximately *$60 million* in secret payments in exchange for the bailout. The

millions paid into Generation Now were not regulated, reported, or subject to public scrutiny, and the Enterprise members spent bribe payments to further their political interests and enrich themselves. As one member of the Enterprise stated in a 2019 recorded conversation, the Company operated as the Enterprise's "Bank." He stated that Generation Now was the Speaker's (c)(4), and FirstEnergy's "deep pockets" and the money paid to the Enterprise through Generation Now was "unlimited." Another member of the Enterprise described the Company's payments to the Enterprise as "Monopoly money."

51.    Moreover, throughout this time period, Defendant Jones conducted over eighty telephone conferences with Householder. Householder further had fourteen phone calls with FirstEnergy's Vice President of External Affairs, and 188 phone calls with the Company's Director of Ohio State Affairs. Thus, the conspiracy was directly orchestrated and overseen by FirstEnergy's upper management, including Defendants.

**Materially False and Misleading Quarterly and Annual Reports**

52.    On February 21, 2017, FirstEnergy filed its annual report for the fiscal year ended December 31, 2016 with the SEC (the "2016 10-K"), which was signed by Defendants Jones, Taylor, and Pearson. The 2016 10-K stated that the Company would be exploring "[l]egislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits." Moreover, with respect to FES, the 2016 10-K stated that "management is exploring capital and other cost reductions, asset sales, and other options to improve cash flow *as well as continuing with legislative efforts to explore a regulatory solution*." (Emphasis added). Furthermore, the 2016 10-K stated that FES "complies with the regulations, orders, policies and practices prescribed by the SEC, FERC, NRC and applicable state regulatory authorities." Defendants Jones and Pearson filed signed certifications with the SEC stating that the 2016 10-

K did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results

of operations, was the product of effective internal controls, and was free from fraud.

53.     On February 22, 2017, the Company held an earnings call with analysts and

investors to discuss the Company's fiscal 2016 financial results, which was led by Jones, Taylor,

and Pearson.  During the call, Defendant Jones stated:

> *In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security.* Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program is expected to be introduced soon. The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. We believe this legislation would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region.
>
> *We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that [FirstEnergy] won't be the long-term owner of these assets. We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds.*

(Emphasis added).

54.     On April 27, 2017, July 27, 2017, and October 26, 2017, FirstEnergy filed its

quarterly reports with the SEC for the quarters ending March 31, 2017, June 30, 2017, and

September 30, 2017, respectively, which were signed by Defendant Taylor.  The filings claimed

that the Company's nuclear power business continued to comply "with the regulations, orders,

policies and practices prescribed by the SEC, FERC, NRC and applicable state regulatory

authorities."   Additionally, the filings continued to highlight the efforts of the Company's

management to secure a regulatory or legislative solution for the problems presented by the

Company's unprofitable nuclear facilities.   Among other things, the filings stated that the

Company's management was "continuing with legislative efforts to explore a regulatory solution"

for FES, or was "continuing . . . efforts to explore legislative or regulatory solutions" for FES.

Defendants Jones and Pearson filed signed certifications with the SEC stating that the quarterly reports did not contain any false or misleading statement of fact, fairly presented the Company's results of operations, were the product of effective internal controls, and were free from fraud.

55.　　On February 20, 2018, the Company filed its annual report for the fiscal year ended December 31, 2017 with the SEC (the "2017 10-K"), which was signed by Jones, Taylor, and Pearson.  The 2017 10-K stated that the Company would be exploring "legislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits." Furthermore, the 2017 10-K stated that FES "complies with the regulations, orders, policies and practices prescribed by the SEC, FERC, NRC and applicable state regulatory authorities."  Jones and Pearson filed signed certifications with the SEC stating that the 2017 10-K did not contain any false or misleading statement of fact, fairly presented the Company's results of operations, was the product of effective internal controls, and was free from fraud.

56.　　On February 21, 2018, the Company held an earnings call with analysts and investors to discuss its fiscal 2017 financial results, which was led by Jones, Taylor, and Pearson. During the call, Defendant Jones stated that the Company had been "very actively involved in a multitude of efforts at both the state and federal levels to support our generation assets," but he was disappointed that those efforts had not yet resulted in "meaningful legislative or regulatory support" for the Company's nuclear facilities.  Jones stated that FES would "continue to look at all options regarding these units," including by "continu[ing] to support policy solutions."

57.　　On April 23, 2018, July 31, 2018, and October 25, 2018, the Company filed its quarterly reports with the SEC for the quarters ending March 31, 2018, June 30, 2018, and September 30, 2018, respectively.  The filings claimed that the Company "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed

by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah filed signed certifications with the SEC stating that the quarterly reports did not contain any false or misleading statement of fact, fairly presented the Company's results of operations, were the product of effective internal controls, and were free from fraud.

58.     On February 19, 2019, FirstEnergy filed its annual report for the fiscal year ended December 31, 2018 with the SEC (the "2018 10-K"), which was signed by Defendants Jones and Strah. The 2018 10-K stated that the Company "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah filed signed certifications with the SEC stating that the 2018 10-K did not contain any false or misleading statement of fact, fairly presented the Company's results of operations, was the product of effective internal controls, and was free from fraud.

59.     On February 20, 2019, the Company held an earnings call with analysts and investors to discuss its fiscal 2018 financial results, which was led by Defendants Jones and Strah. In response to an analyst's question regarding whether there was "anything at all" that FirstEnergy was working on with respect to energy utility legislation in Ohio, Defendant Jones stated:

> Not in any specific form, Julien. Obviously, if our new leaders of the states – we have a new governor, a new speaker of the house, we're going to have a new Chairman of the Public Utilities Commission. *If they determine that they think the time is right to really put energy policy for the state back on the table in some fashion, legislatively, then we would expect to engage and provide our input.* But it's too early in the process for me to talk about what that might mean.

(Emphasis added).

60.     On April 23, 2019, July 23, 2019, and November 4, 2019, the Company filed its

14

quarterly reports with the SEC for the quarters ending March 31, 2019, June 30, 2019, and September 30, 2019, respectively. The filings claimed that the Company "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah filed signed certifications with the SEC stating that the quarterly reports did not contain any false or misleading statement of fact, fairly presented the Company's results of operations, were the product of effective internal controls, and were free from fraud.

61. On February 10, 2020, the Company filed its annual report for the fiscal year ended December 31, 2019 with the SEC (the "2019 10-K"), which was signed by Defendants Jones and Strah. The 2019 10-K stated that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah filed signed certifications with the SEC stating that the 2019 10-K did not contain any false or misleading statement of fact, fairly presented the Company's results of operations, was the product of effective internal controls, and was free from fraud.

62. On April 23, 2020, the Company filed its quarterly report with the SEC for the quarter ending March 31, 2020. The filing claimed that the Company "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah filed signed certifications with the SEC stating that the quarterly report did not contain any false or misleading statement of fact,

fairly presented the Company's results of operations, was the product of effective internal controls, and was free from fraud.

63. The above-referenced statements were materially false and/or misleading when made because they failed to disclose adverse facts pertaining to the Company's business, operations, and financial condition. Specifically, the statements failed to disclose, among other things, that: (i) the Company, its representatives, and affiliates orchestrated a $60 million campaign to secure the passage of legislation favoring the Company and its affiliates; (ii) the Company, its representatives, and affiliates secretly funneled tens of millions of dollars to and bribed Ohio politicians to secure votes in favor of House Bill 6, a $1.3 billion bailout for the Company's unprofitable nuclear facilities; (iii) the Company, its representatives, and affiliates conducted an advertising campaign in support of House Bill 6 and against a ballot initiative to repeal House Bill 6 by passing millions of dollars through entities to conceal the Company's involvement; (iv) the Company's regulatory and legislative efforts were materially false and misleading; (v) the Company was subject to risk of reputational, legal, and financial harm; and (vi) the Company's activities were likely to have a material adverse impact on FirstEnergy's financial and business results.

**Materially False and Misleading Proxy Statements**

64. On March 30, 2018, FirstEnergy filed its 2018 annual proxy statement with the SEC (the "2018 Proxy"). The 2018 Proxy sought FirstEnergy stockholder approval of, among other things, the reelection of the Directors Defendants and approval of executive compensation on an advisory basis.

65. The 2018 Proxy omitted any disclosures regarding the FirstEnergy/Enterprise bribery scheme. At the time the Director Defendants reviewed and approved the 2018 Proxy, they

had knowledge of the bribery scheme, which placed FirstEnergy at material risk, but wrongfully failed to disclose this information to the Company's stockholders.

66.     Due to the false and/or misleading statements in the 2018 Proxy, on May 15, 2018, the Company's stockholders voted to approve the proposals contained in the 2018 Proxy, including the proposals to reelect the Director Defendants and approve executive compensation.  If the Company's stockholders were fully informed regarding the bribery scheme, they would not have voted to reelect the Director Defendants or approved FirstEnergy's executive compensation.

67.     On April 1, 2019, FirstEnergy filed its 2019 annual proxy statement with the SEC (the "2019 Proxy").  The 2019 Proxy sought FirstEnergy stockholder approval of, among other things, the reelection of the Directors Defendants and approval of executive compensation on an advisory basis.

68.     The 2019 Proxy omitted any disclosures regarding the FirstEnergy/Enterprise bribery scheme.  At the time the Director Defendants reviewed and approved the 2019 Proxy, they had knowledge of the bribery scheme, which placed FirstEnergy at material risk, but wrongfully failed to disclose this information to the Company's stockholders.

69.     Due to the false and/or misleading statements in the 2019 Proxy, on May 21, 2019, the Company's stockholders voted to approve the proposals contained in the 2019 Proxy, including the proposals to reelect the Director Defendants and approve executive compensation.  If the Company's stockholders were fully informed regarding the bribery scheme, they would not have voted to reelect the Director Defendants or approved FirstEnergy's executive compensation.

70.     On April 1, 2020, FirstEnergy filed its 2020 annual proxy statement with the SEC (the "2020 Proxy," and together with the 2018 Proxy and the 2019 Proxy, the "Proxies").  The 2020 Proxy sought FirstEnergy stockholder approval of, among other things, the reelection of the

Directors Defendants, executive compensation on an advisory basis, and a 2020 Incentive Compensation Plan.

71.     The 2020 Proxy omitted any disclosures regarding the FirstEnergy/Enterprise bribery scheme.  At the time the Director Defendants reviewed and approved the 2020 Proxy, they had knowledge of the bribery scheme, which placed FirstEnergy at material risk, but wrongfully failed to disclose this information to the Company's stockholders.

72.     Due to the false and/or misleading statements in the 2020 Proxy, on May 19, 2020, the Company's stockholders voted to approve the proposals contained in the 2020 Proxy, including the proposals to reelect the Director Defendants, approve executive compensation, and approve the Incentive Compensation Plan.  If the Company's stockholders were fully informed regarding the bribery scheme, they would not have voted to reelect the Director Defendants, approved FirstEnergy's executive compensation program, or approved the Incentive Compensation Plan.

**The Criminal Action is Filed and the Truth Emerges**

73.     On July 21, 2020, the U.S. Attorney's Office for the Southern District of Ohio announced that Householder and certain affiliates were arrested and charged in the Criminal Action.  *USA v. Borges*, Case No. 1:20-mj-00526 (S.D. Ohio).  According to the press release announcing the Criminal Action:

> FOR IMMEDIATE RELEASE
> Tuesday, July 21, 2020
>
> **Ohio House Speaker, former chair of Ohio Republican Party, 3 other individuals & 501(c)(4) entity charged in federal public corruption racketeering conspiracy involving $60 million**
>
> COLUMBUS, Ohio – The Ohio Speaker of the House was arrested this morning and charged in a federal racketeering conspiracy involving approximately $60 million paid to a 501(c)(4) entity to pass and uphold a billion-dollar nuclear plant

bailout.

It is alleged that Larry Householder, 61, of Glenford, Ohio, and the enterprise conspired to violate the racketeering statute through honest services wire fraud, receipt of millions of dollars in bribes and money laundering.

 Four other individuals were also arrested and charged. They include:

- Mathew Borges, 48, of Bexley, a lobbyist who previously served as chair of the Ohio Republican Party;
- Jeffrey Longstreth, 44, of Columbus, Householder's longtime campaign and political strategist;
- Neil Clark, 67, of Columbus, a lobbyist who owns and operates Grant Street Consultants and previously served as budget director for the Ohio Republican Caucus; and
- Juan Cespedes, 40, of Columbus, a multi-client lobbyist.

Generation Now, a corporate entity registered as a 501(c)(4) social welfare organization, was also charged.

The five individual defendants had initial appearances via video conference at 1pm today, at which time the case was unsealed.

According to the 80-page criminal complaint unsealed today, from March 2017 to March 2020, the enterprise received millions of dollars in exchange for Householder's and the enterprise's help in passing House Bill 6, a billion-dollar bailout that saved two failing, Ohio nuclear power plants from closing.

The defendants then also allegedly worked to corruptly ensure that HB 6 went into effect by defeating a ballot initiative to overturn the legislation. The Enterprise received approximately $60 million into Generation Now from an energy company and its affiliates during the relevant period.

As alleged, in February 2017, Longstreth incorporated Generation Now as a 501(c)(4) social welfare entity purporting to promote energy independence and economic development; however, the entity was secretly controlled by Householder. As Clark stated in a recorded conversation, "*Generation Now is the Speaker's (c)(4).*" Pursuant to federal law, the names and addresses of contributors to 501(c)(4)s are not made available for public inspection.

In March 2017, Householder began receiving quarterly $250,000 payments from the related-energy companies into the bank account of Generation Now. The defendants allegedly spent millions of the company's dollars to support Householder's political bid to become Speaker, to support House candidates they believed would back Householder, and for their own personal benefit.  When asked how much money was in Generation Now, Clark said, "*it's unlimited*."

The affidavit filed in support of the criminal complaint also alleges:

- In 2018, the enterprise spent energy company-to-Generation Now money on approximately 21 different state candidates – 15 (including Householder) in the primary, and six additional candidates in the general election.  The Enterprise spent more than one million in fall 2018 alone to flood the airways with negative ads against enterprise opponents.  Most of these candidates won the 2018 general election. All who won voted for Householder as Speaker.

- Money passed from the energy company through Generation Now was used to pay for Householder campaign staff, which would otherwise have been paid by Householder's candidate committee, Friends of Larry Householder.

- Householder received more than $400,000 in personal benefits as a result of the payments into Generation Now, including funds to settle a personal lawsuit, to pay for costs associated with his residence in Florida, and to pay off thousands of dollars of credit card debt.

- The enterprise paid $15,000 to an individual to provide insider information about the ballot initiative and offered to pay signature collectors for the ballot initiative $2,500 cash and plane fare to stop gathering signatures.

The racketeering conspiracy as charged in this case is punishable by up to 20 years in prison.

"It takes courage for citizens to assist law enforcement in the ways detailed in the affidavit," U.S. Attorney David M. DeVillers said. "We are grateful to those who felt a moral duty to work together with agents in bringing to light this alleged, significant public corruption."

"All forms of public corruption are unacceptable," stated FBI Cincinnati Special

Agent in Charge Chris Hoffman. "When the corruption is alleged to reach some of the highest levels of our state government, the citizens of Ohio should be shocked and appalled."

The case is being investigated by the FBI. Deputy Criminal Chief Emily N. Glatfelter, Assistant United States Attorney Matthew C. Singer, as well as Assistant Deputy Criminal Chief Timothy Mangan and Assistant United States Attorney Megan Gaffney Painter, are representing the United States in this case.

74.     The same day, an over eighty-page criminal complaint and affidavit were filed in the Criminal Action.  The filings described the scheme by the Company and its affiliates to corrupt the political process in Ohio to secure passage of House Bill 6.  The claims alleged in the Criminal Action were supported by recorded conversations, text messages, documentary evidence, and detailed transcripts of phone calls.

75.     Following this news, the Company's stock price fell to a low of only $22.85 per share on July 22, 2020, *forty-five percent* below the stock's closing price on July 20, 2020 of $41.26 per share, on abnormally high trading volume.

**Harm to the Company**

76.     As a result of Defendants' breaches of fiduciary duties and other violations of law as described herein, the Company has and will continue to suffer substantial harm.

77.     The Criminal Action filed in July 2020 details the corrupt scheme pursued by FirstEnergy and its affiliates to secure the passage of House Bill 6.  The Company faces significant costs, expenses, and fines in connection therewith.

78.     Additionally, FirstEnergy, Jones, Pearson, Strah, and Taylor have been named as defendants in a complaint for violations of the federal securities laws filed in this Court in connection with the wrongdoing alleged herein.  *Owens v. FirstEnergy Corp.*, Case No. 2:20-cv-03785 (S.D. Ohio) (the "Securities Action").  The Securities Action seeks remedies against the

Company and its officers under Sections 10(b) and 20(a) of the Exchange Act and Rule l0b-5 promulgated thereunder. FirstEnergy will incur potentially substantial legal fees and costs in connection with the Securities Action.

79. Furthermore, several class action complaints have been filed in this Court against FirstEnergy alleging that the Company engaged in racketeering activity in violation of 18 U.S.C. § 1962 by committing the wrongdoing alleged herein. *See Smith v. FirstEnergy Corp.*, Case No. 2:20-cv-03755 (S.D. Ohio); *Hudock v. FirstEnergy Corp.*, Case No. 2:20-cv-03954 (S.D. Ohio) (the "Hudock Action"); *Buldas v. FirstEnergy Corp.*, Case No. 2:20-cv-03987 (S.D. Ohio) (the "Buldas Action").

80. Moreover, FirstEnergy's business, goodwill, and reputation have been gravely injured, and the Company's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the misconduct alleged herein.

81. Defendants' actions have irreparably damaged the Company's corporate image and goodwill. For at least the foreseeable future, the Company will suffer from the "liar's discount," such that the Company's ability to raise equity capital and/or debt on favorable terms is now impaired.

## **DEFENDANTS' FIDUCIARY DUTIES**

82. By reason of their positions as officers and directors of the Company, and because of their ability to control the business and corporate affairs of the Company, Defendants owed and continue to owe the Company and its stockholders fiduciary duties of loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders.

83. Each FirstEnergy director and officer owes to the Company and its stockholders

the fiduciary duty to exercise good faith and diligence in the administration of the Company and the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

84.     Defendants, due to their positions of control and authority as directors and/or officers of FirstEnergy, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

85.     To discharge their duties, the officers and directors of FirstEnergy were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

86.     The conduct of Defendants described herein involves a knowing and culpable violation of their obligations as directors and officers of FirstEnergy, the absence of good faith on their part, and/or a reckless disregard for their duties owed to the Company and its stockholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

87.     The conduct of Defendants who were also officers and directors of the Company has been ratified by the Director Defendants who collectively comprised FirstEnergy's Board at all relevant times.

88.     Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.

89.     To discharge their duties, the officers and directors of FirstEnergy were required

to, among other things: (i) ensure that FirstEnergy was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Ohio and the United States, and pursuant to the Company's Code of Business Conduct; (ii) conduct the affairs of FirstEnergy in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting FirstEnergy's assets, and to maximize the value of FirstEnergy's stock; (iii) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; (iv) establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the directors and to periodically investigate, or cause independent investigation to be made of, said reports and records; (v) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws, and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and FirstEnergy's stockholders would be accurate; (vi) exercise reasonable control and supervision over the public statements made by FirstEnergy's officers and employees and any other reports or information that FirstEnergy was required by law to disseminate; (vii) refrain from unduly benefiting themselves and other FirstEnergy insiders at the expense of FirstEnergy and its stockholders; and (viii) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of FirstEnergy and to make full and accurate disclosure of all material facts concerning, among other things, each of the subjects and duties set forth above.

90.     Each of the Defendants further owed to the Company and its stockholders the duty

of loyalty requiring that each Defendant favor FirstEnergy's and its stockholders' interests over his or her own while conducting the affairs of the Company, and refrain from using his or her position, influence, or knowledge of the affairs of the Company to gain personal advantage.

91. At all times relevant hereto, Defendants were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

92. Because of their advisory, executive, managerial, and directorial positions with FirstEnergy, each of the Defendants had access to adverse, non-public information about the Company.

93. Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements made by the Company.

94. Moreover, the Company's corporate documents detail the requirements of the Board's duties, requiring, among other things, that the Board actively identify and report any illegal and/or unethical business practices within the Company.

95. FirstEnergy's Code of Business Conduct provides, in relevant part:

This Code of Business Conduct (the "Code") serves as a reminder of the high standards we must meet in our day-to-day business activities. It also helps to guide us when formulating and pursuing Company goals and objectives.

FirstEnergy personnel are all responsible for complying with applicable laws and regulations and the principles and provisions included in this Code.

No single book or code of conduct policy can provide answers to every situation. This Code is to be used as a guide for ethical conduct and help foster a culture of honesty and accountability. It is endorsed by FirstEnergy's Board of Directors and executives, communicates our culture of intolerance for retaliation, provides policy guidance, and concludes with a question and answer section.

It is the responsibility of every one of us to comply with all applicable laws, rules and regulations and all provisions of this Code and related policies and procedures. This Code is designed to encourage you to lead by example with ethics and integrity and engage in open, honest, direct, and ongoing dialogue. In addition, our Company

has adopted a Corporate Compliance Program ("Program") to assist all business units and personnel to fully comply with all applicable laws, regulations, and policies. The Program demonstrates that we intend to operate our business in accordance with sound business ethics. It includes many guiding principles for specific standards of conduct.

"Maintaining high ethical standards builds trust with customers, shareholders, FirstEnergy Personnel, and the communities we serve. At FirstEnergy, we are all responsible for upholding high standards and being aware of ethical issues that we may face on the job."

*Fair Dealing* - We have built a reputation as a trustworthy and ethical member of our community and our industry. We are committed to maintaining the highest levels of integrity and fairness within our Company. When we fail to negotiate, perform, or market in good faith, we may seriously damage our reputation and lose the loyalty of our customers. You must conduct business, including dealings with the Company's customers, suppliers, competitors and other personnel, Code of Business Conduct 6 honestly and fairly and not take unfair advantage of anyone through any misrepresentation of material facts, manipulation, concealment, abuse of privileged information, fraud, bribes, kickbacks, illegal payments, cash gifts, cash equivalent gifts or other unfair business practices. Also, please be aware that special rules apply when dealing with government employees. You should direct any questions about dealing with government employees to your supervisor.

*Conflicts of Interest* - We should all be aware of any potential influences that impact or appear to impact our loyalty to FirstEnergy. A "conflict of interest" can occur when your personal interest interferes with – or may appear to interfere with – the interests of the Company as a whole, or when your personal interests make it difficult for you to perform your job duties objectively and effectively. Conflicts of interest also arise when personnel, or a member of his or her immediate family, receives improper personal benefits as a result of his or her position with the Company. Avoid situations in which your personal interests are in conflict, or appear to be in conflict, with the interests of the Company or your job responsibilities. This includes the use of knowledge gained through your work activities to make decisions that will lead to personal gain and that are contrary to the law or the interests of the Company. This also includes financial relationships, including equity interests and loans to, or guarantees of obligations of, the party with the FirstEnergy relationship. Furthermore, the Company will not make any loans or guarantees to executive officers or their family members.

You also have the specific responsibility of understanding and abiding by the Company's expanded Conflicts of Interest Policy.

96.     Moreover, the Company's Conflict of Interest Policy provides:

All personnel, including the Chief Executive Officer, Chief Financial Officer and

Chief Accounting Officer, have an obligation to conduct Company-related business in an environment free from the influence of conflicting personal interests. Generally, a conflict of interest arises when our position or job responsibilities present an opportunity for personal gain or when an obligation or situation resulting from our personal activities and financial affairs may influence our judgment and action in the performance of our Company duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

97.  Plaintiff brings this action derivatively in the right and for the benefit of FirstEnergy to redress injuries suffered and to be suffered by the Company as a result of Defendants' breaches of fiduciary duties and other wrongful conduct alleged herein.

98.  FirstEnergy is named as a nominal defendant solely in a derivative capacity.

99.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

100.  Plaintiff has continuously been a shareholder of the Company at times relevant to the wrongdoing complained of herein and is a current FirstEnergy shareholder.

101.  Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced to prosecute this action.

102.  When this action was filed, FirstEnergy's Board consisted of eleven directors: Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner.

103.  For the reasons set forth below, Plaintiff did not make a demand on the Board to initiate this action because such a demand would be a futile, wasteful, and useless act, and is thus excused.

**The Board Repeatedly Recommended Against Stockholder Proposals to Have Full Transparency Regarding FirstEnergy's Lobbying Activities**

104.    Nine of the current eleven Board served as directors as of March 2017:  Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, and Reyes.

105.    On March 31, 2017, the Company filed a proxy statement with the SEC (the "2017 Proxy").  The 2017 Proxy contained shareholder proposal Item 9:  "Shareholder Proposal Requesting an Annual Report on Lobbying Policies and Payments" ("Proposal 9").  According to the 2017 Proxy, FirstEnergy stockholder The Nathan Cummings Foundation planned to introduce Proposal 9 at the Company's annual meeting:

> Whereas: we believe full disclosure of our company's direct and indirect lobbying activities and expenditures is required to assess whether FirstEnergy's lobbying is consistent with its expressed goals and in the best interests of shareholders.
>
> Resolved, the shareholders of FirstEnergy request the preparation of a report, updated annually, disclosing:
>
> > a.    Company policies and procedures governing lobbying, both direct and indirect, and grassroots lobbying communications.
> >
> > b.    Payments by FirstEnergy used for (a) direct or indirect lobbying or (b) grassroots lobbying communications, in each case including the amount of the payment and the recipient.
> >
> > c.    FirstEnergy's membership in and payments to any tax-exempt organization that writes and endorses model legislation.
> >
> > d.    A description of the decision making process and oversight by management and the Board for making payments described in section 2 and 3 above.
>
> For purposes of this proposal, a "grassroots lobbying communication" is a communication is a communication directed to the general public that (a) refers to specific legislation or regulation, (b) reflects a view on the legislation or regulation and (c) encourages the recipient of the communication to take action with respect to the legislation or regulation. "Indirect lobbying" is lobbying engaged in by a trade association or other organization of which FirstEnergy is a member.
>
> Both "direct and indirect lobbying" and "grassroots lobbying communications"

includes efforts at the local, state and federal levels.

The report shall be presented to the Audit Committee or other relevant oversight committee and posted on FirstEnergy's website.

As shareholders, we encourage transparency and accountability in FirstEnergy's use of corporate funds to influence legislation and regulation, both directly and indirectly. FirstEnergy spent approximately $4.05 million in 2014 and 2015 on direct federal lobbying activities (opensecrets.org). These figures do not include lobbying expenditures to influence legislation in states, where FirstEnergy also lobbies but disclosure is uneven or absent. For example, FirstEnergy spent $1.07 million on lobbying in New Jersey for 2014 and 2015, and FirstEnergy's lobbying on energy rates in West Virginia has drawn media attention ("FirstEnergy Asking for Surcharge to Fund Improvements," *Charleston Gazette-Mail,* August 25, 2016).

FirstEnergy is listed as a member of the of the Edison Electric Institute and Nuclear Energy Institute, which together spent $21.32 million lobbying in 2014 and 2015. However, FirstEnergy does not disclose its membership in, or payments to, trade associations, or the amounts used for lobbying, despite a 2007 agreement with shareholders to annually disclose trade association payments used for political purposes ("More Firms to Make Political Disclosures," *CFO,* April 4, 2007). Nor does FirstEnergy disclose membership in or contributions to tax exempt organizations that write and endorse model legislation, such as the American Legislative Exchange Council.

We are concerned that FirstEnergy's current lack of trade association disclosure presents reputational risk. Absent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long- term interests.

106.    However, the Board recommended against the approval of Proposal 9, which would

have required the disclosure of the illegal payments discussed herein.  As set forth in the 2017

Proxy:

Your company believes that it has a responsibility to participate in the legislative, regulatory and political process. Sharing its views and educating officeholders, regulators, community and business leaders, and the public on key issues helps your Company promote effective government and the interests of key stakeholder groups including our shareholders, employees and communities we serve. By engaging with elected officials, regulators, community and business leaders, and other decision makers, your Company strives to conduct its business as transparently as possible to serve customers effectively and help build public trust.

In addition to the existing extensive framework of laws and public disclosure, your Company adopted a Political Activity Policy, which was most recently updated in

October 2016. The Political Activity Policy addresses your Company's participation in the political process and political contributions and lobbying expenses.

Such policy can be found at https://www.FirstEnergycorp.com/investor/corporate_governance/policies_charters/corporate_political_activity_policy.html.

The Political Activity Policy also provides links to access your Company's federal lobbing reports. Your Company complies with all federal and state lobbying registration and disclosure requirements, which include filing all required reports with the U.S. Congress and applicable state agencies.

These reports detail information such as the particular bills and issues on which individual lobbyists had activity on behalf of your Company, as well as the lobbying expenses for specific time periods. As set forth in the Political Activity Policy, your Company maintains and files Lobbying Disclosure Act Reports (Form LD-2) with the U.S. Congress. These reports detail the particular bills and issues on which individual lobbyists had activity on behalf of your Company, as well as the total lobbying expenses, including payments made to trade organizations. These reports may be found at:
http://www.senate.gov/legislative/Public_Disclosure/LDA_reports.htm.

Additionally, as described in the Political Activity Policy, your Company and its registered federal lobbyists must also file semi-annual reports detailing, among other things, disbursements and personal and/or direct contributions to federal candidates national party committees. These forms (LD-203) may be found at:
http://www.senate.gov/legislative/Public_Disclosure/LDA_reports.htm.

State reports disclosing activity at the state and local levels, if required, are also made publicly available for review on the applicable state agency website.

Your Company is committed to providing appropriate information and disclosures to its investors concerning its lobbying activities. Additionally, your Company believes that its current procedures and policies promote transparency and compliance with the law and addresses the concerns identified in the proposal. Preparation of reports beyond what is already produced would be a duplicative and onerous task that would divert important resources from alternative efforts that your Company's Board and management deem to be in the best interests of your Company and its shareholders. Substantially similar shareholder proposals did not receive a majority of the votes cast in 2015 and 2016.

Your Board recommends that you<br>
Vote "AGAINST" this shareholder proposal (Item 9).

107. The Board recommended against proposals similar to Proposal 9 in 2015 and 2016.

30

**The Director Defendants Face a Substantial Likelihood of Liability**

108.    The Director Defendants breached their fiduciary duties and engaged in other violations of law as set forth herein, and face a substantial likelihood of liability in connection therewith.

109.    The size of the contributions totaling over $60 million could not have been accomplished without the Director Defendants' knowledge and approval.

110.    All of the Director Defendants were required to participate in both the review and approval of FirstEnergy's activities, including, *inter alia*, payment of over $60 million to assist the Enterprise, which resulted in the billion-dollar bailout of the Company's failed nuclear power plants.

111.    Furthermore, the Director Defendants were directors either throughout or during part of the time the false and misleading statements discussed herein were made.  The Director Defendants had and have a duty to ensure that FirstEnergy's SEC filings, press releases, and other public statements on behalf of FirstEnergy concerning its business, operations, prospects, internal controls, and financial statements were accurate.

112.    The Director Defendants knowingly and consciously reviewed, authorized, and/or caused the dissemination of the materially false and misleading statements discussed herein, which caused FirstEnergy's stock to trade at artificially inflated prices.

113.    The Director Defendants face a substantial likelihood of liability for, among other things, their: (i) conscious and knowing making and/or authorization of false and misleading statements; (ii) failure to timely correct such statements; (iii) failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective, and were being implemented effectively; and (iv) failure to take necessary and

appropriate steps to ensure that the Director Defendants' duties were being discharged in good faith and with the required diligence.

114. If the Director Defendants were to initiate a lawsuit on behalf of the Company to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability, which they will not do.

**The Corporate Governance and Corporate Responsibility Committee Members**

115. Defendants Johnson, Misheff, Mitchell, and Reyes (the "CGCR Committee Defendants") were members of the Corporate Governance and Corporate Responsibility Committee during the period of wrongdoing alleged herein and allowed Defendants to engage in the bribery scheme.

116. The responsibilities of the Corporate Governance and Corporate Responsibility Committee included:

Public Policy and Engagement

We have decision-making and oversight processes in place for political contributions and expenditures. Our Corporate Political Activity Policy available on our website describes the criteria for certain political contributions and ballot initiative expenditures and the process for approving such contributions and expenditures. Also, your Board's Corporate Governance and Corporate Responsibility Committee periodically reviews this policy and related practices as well as dues and/or contributions to industry groups and trade associations.

117. However, the CGCR Committee Defendants failed to stop the over $60 million that was transferred from the Company to the Enterprise in exchange for securing House Bill 6.

**The Audit Committee Members**

118. Defendants Anderson, Misheff, Pianalto, and Turner (the "Audit Committee Defendants") were members of the Audit Committee during the period of wrongdoing alleged herein, participated in and knowingly approved the filing of false statements, and allowed the

Director Defendants to repeatedly make false and misleading statements to the investing public.

119. As members of the Audit Committee, the Audit Committee Defendants were required to review FirstEnergy's quarterly and annual reports to ensure that they were accurate.

120. However, the Audit Committee Defendants failed to ensure the integrity of FirstEnergy's financial statements and financial reporting process, FirstEnergy's systems of internal accounting and financial controls, and other financial information provided by FirstEnergy, as required by the Audit Committee's Charter.

**Defendant Jones**

121. Notably, throughout the period of wrongdoing, Defendant Jones conducted over eighty telephone conferences with Householder.

122. Moreover, Jones earns an annual salary of over $9 million for serving as CEO of the Company, which is a material amount to him. Jones will not independently consider whether to initiate litigation against himself or the Board members who determine his compensation.

123. Further, Jones is a defendant in the Securities Action, the Hudock Action, and the Buldas Action. He will not decide to initiate litigation against himself because doing so will compromise his defense of the Securities Action, the Hudock Action, and the Buldas Action.

124. For all of the foregoing reasons, each of the Director Defendants (and at a minimum, a clear majority of the Director Defendants) cannot consider a demand with disinterestedness or independence, and demand upon the Board would be futile.

## COUNT I

### Breach of Fiduciary Duties Against All Defendants

125. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

126. Each Defendant owed to FirstEnergy fiduciary duties, including the duty to exercise

candor, good faith, due care, and loyalty in the management and administration of the Company's business and affairs.

127.     Defendants have violated their fiduciary duties owed to the Company by engaging in the misconduct alleged herein.

128.     By virtue of their positions as directors and/or officers of FirstEnergy, as well as their exercise of control over the business and corporate affairs of the Company, Defendants have, and at all relevant times had, the power to control and influence, and did control and influence and cause the Company to engage in the conduct alleged herein.

129.     Each Defendant was required to use his or her ability to control and manage FirstEnergy in a fair, just, and equitable manner, and act in furtherance of the best interests of FirstEnergy and its shareholders and not his or her own interests.

130.     Moreover, Defendants have a duty to implement a reasonable system of controls to ensure that the Company is operated in accordance with all applicable laws.  Defendants also have a duty to respond in good faith to reports or indications that FirstEnergy or its employees are engaging in unlawful or other improper behavior, and have a duty to oversee the Company's CEO to ensure that he is not breaching his fiduciary duties.

131.     Defendants have acted in violation of the law and FirstEnergy's internal policies, including, among others, its policies regarding corporate governance, business conduct, and ethics, by causing FirstEnergy to engage in the bribery scheme and to issue false and misleading statements.

132.     Additionally, at the times Defendants Jones and Pearson sold their FirstEnergy shares as discussed above, they knew but did not publicly disclose that FirstEnergy was engaging in the bribery scheme, had inadequate internal controls, and made false and misleading statements.

Jones and Pearson made their stock sales on the basis of and due to their knowledge of material non-public information.  Defendants Jones and Pearson knew that the bribery scheme, inadequate internal controls, and false and misleading statements would likely result in the artificial inflation of FirstEnergy's stock price.  Accordingly, their sales of stock based on their knowledge of material non-public information was a breach of their fiduciary duties of loyalty and good faith.

133.    Based on the misconduct alleged herein, Defendants were not acting in good faith toward the Company, but instead were acting recklessly and/or with intent to harm the Company, and breached their fiduciary duties.

134.    As a direct and proximate result of Defendants' conscious failure to fulfill their fiduciary duties, FirstEnergy has been and will continue to be damaged.

135.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

136.    Plaintiff, on behalf of First Energy, has no adequate remedy at law.

## COUNT II

### Unjust Enrichment Against All Defendants

137.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

138.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of the Company.

139.    Defendants were unjustly enriched as a result of the compensation and remuneration they received while breaching their fiduciary duties owed to the Company.

140.    Moreover, Defendants Jones and Pearson were unjustly enriched through their illegal sales of FirstEnergy stock as discussed above.  It would be unconscionable to allow them to keep the benefits of their misconduct.

141.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from

Defendants, and each of them, and seeks an Order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

142.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT III

### Violations of Section 14(a) of the Exchange Act Against Defendants

143.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

144.    Section 14(a) of the Exchange Act provides:

It shall be unlawful for any person, by use of the mails or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations at the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

145.    Rule 14a-9, promulgated under Section 14(a) of the Exchange Act, provides that no proxy statements shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

146.    Under the direction of Defendants, the Proxies failed to disclose, among other things, the illegal bribery scheme described herein, and that the Company failed to maintain adequate controls and oversight to prevent such wrongful conduct, thus rendering the filings false and misleading.

147.    In the exercise of reasonable care, Defendants should have known that by misrepresenting and/or failing to disclose the forgoing material facts, the statements contained in

the Proxies were materially false and misleading. The misrepresentations and omissions were material to the Company's shareholders in voting on the proposals contained in the Proxies.

148. The Company was damaged as a result of Defendants' material misrepresentations and omissions in the Proxies.

149. Plaintiff, on behalf of FirstEnergy, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all Defendants as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of FirstEnergy and that Plaintiff is an adequate representative of the Company;

B. Appointing Plaintiff as lead plaintiff and Plaintiff's counsel as lead counsel for this derivative action;

C. Declaring that Defendants have breached their fiduciary duties to FirstEnergy;

D. Declaring that Defendants have violated Section 14(a) of the Exchange Act and SEC Rule 10b-5;

E. Awarding to FirstEnergy the damages sustained as a result of the violations set forth herein from each of the Defendants, jointly and severally, together with pre-and post-judgment interest thereon;

F. Directing FirstEnergy to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with all applicable laws and protect the Company and its stockholders from a recurrence of the misconduct described herein or similar misconduct;

G. Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  September 3, 2020

Respectfully submitted,

*/s/ Daniel R. Mordarski*
Daniel R. Mordarski (0063228)
Law Offices of Daniel R. Mordarski LLC
5 East Long Street, Suite 1100
Columbus, Ohio 43215
(614) 221-3200 (Telephone)
(614) 221-3201 (Facsimile)
dan@mordarskilaw.com

*Trial Attorney for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky, Esq.
Gina M. Serra, Esq.
300 Delaware Avenue, Suite 210
Wilmington, Delaware 19801
(302) 295-5310

**GRABAR LAW OFFICE**
Joshua H. Grabar, Esq.
1650 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(267) 507-6085